UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CENTERBOARD SECURITIES, LLC,    )
                                )
            Plaintiff,          )
                                )        CIVIL ACTION NO.
VS.                             )
                                )        3:15-CV-2611-G
BENEFUEL, INC.,                 )
                                )
            Defendant.          )

MEMORANDUM OPINION AND ORDER

Before the court are (1) the defendant Benefuel Inc. ("Benefuel")'s motion for summary judgment (docket entry 39) and (2) Benefuel's supplemental motion for summary judgment (docket entry 117). For the reasons stated below, Benefuel's motion for summary judgment is granted in part, and denied in part, and Benefuel's supplemental motion for summary judgment is denied.

I. BACKGROUND

A. Factual Background

This dispute arises out of a contract in which the plaintiff, Centerboard Securities, LLC ("Centerboard"), agreed to provide Benefuel with financial advisory

services.  *See generally* Centerboard's Amended Complaint ("Amended Complaint")

(docket entry 44).  Centerboard is a broker dealer registered with the Securities and

Exchange Commission ("SEC") and a member of the Financial Industry Regulatory

Authority, Inc. ("FINRA").  *Id.* ¶ 6.  "Benefuel is an alternative energy company

focused on producing fuels, lubricants and chemicals derived from non-food related

fats and oils."  *Id.* ¶ 7.

Around March 2012, Benefuel entered into a joint venture with Flint Hills

Resources Renewables, LLC ("Flint Hills") to develop biodiesel production

capabilities, including retrofitting the Beatrice Nebraska biodiesel plant (the "Beatrice

project") for operation.  *Id.* ¶ 9.  Flint Hills is also a shareholder of Benefuel and holds

pre-emptive rights, which give Flint Hills and other investors the right to purchase

additional shares in Benefuel in order to prevent dilution of their pro rata equity

ownership.  *Id.* ¶ 10.

In October 2013, Centerboard and Benefuel met in Dallas, Texas to begin

initial discussions regarding the terms of an engagement agreement between

Centerboard and Benefuel.  *See* Defendant's Motion for Summary Judgment

("Motion") ¶ 6 (docket entry 39).  The parties sent drafts of the engagement

agreement back and forth before entering into an agreement on December 1, 2013.

*Id.* ¶¶ 7-12; *see also* Plaintiff's Response in Opposition to Defendant's Motion for

Summary Judgment and Response to Defendant's Statement of Undisputed Facts

("Response") ¶¶ 7-12 (docket entry 55); Centerboard's Appendix in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Centerboard's MSJ App.") at CB App. 00015-18 (docket entry 57).  Under the agreement, Centerboard agreed to act as financial advisor to Benefuel "in connection with a Transaction" to help identify and contact potential investors and/or strategic partners, analyze investments, and assist in the negotiation and financial aspects of the investments.  *Id.* at CB App. 00015.

Centerboard agreed to act as financial advisor to Benefuel "in connection with an investment in [Benefuel] or in another vehicle (including, but not limited to, [the Beatrice project]) or through an extraordinary transaction with any of the foregoing to fund [Benefuel's] corporate development, and/or [the Beatrice project] (a "Transaction")." *Id.* Benefuel agreed to pay Centerboard -- as compensation for its services under the agreement -- work fees and success fees. *Id.* Benefuel agreed to pay Centerboard a work fee of "$15,000 payable in cash each month, such amount to be deducted from any success fee." *Id.* (hereinafter "work fee (cash)").  Additionally, Benefuel agreed to pay Centerboard a work fee of "$15,000 per month, payable in equity at the Transaction price, and due upon successful completion of a Transaction." *Id.* (hereinafter "work fee (equity)").

Further, Benefuel agreed to pay Centerboard a success fee of:

> 7% of any Aggregate investment, payable in cash at the
> time cash proceeds of such investment are received

> (reduced by the amount of the cash work fee paid).  For purposes hereof, Aggregate Investment shall mean the total amount of all investments received in connection with a Transaction and shall include any amounts committed during the term of this Agreement or during the Tail Period and funded subsequent to the expiration of this Agreement.

*Id.*  If the aggregate investment is provided by any of Hercules Technology Growth Capital, Suncor Energy Inc. ("Suncor"), Silver Lake Management LLC, Black Corral Capital or CHS Inc. or the affiliates of each of the foregoing, "the success fee will be reduced to 5% of any Aggregate Investment."  *Id.*  "Further, for current investors of [Benefuel] or any investment vehicle related to the Beatrice project, the 7% Success Fee will be applied to only that Aggregate Investment which increases their pro rata equity ownership."  *Id.*  Lastly, the agreement included a provision that Benefuel did not owe Centerboard a success fee for "the exercise of currently outstanding warrants or the equity issues upon conversion of currently outstanding convertible debt" or any investment into the Beatrice project that might arise out of Benefuel's current discussions with investors.  *Id.* at CB App. 00015-16.

Some of Benefuel's investors -- including Flint Hills and Centerboard -- hold pre-emptive rights that give those investors the right to purchase additional equity to maintain their respective pro rata equity ownership.  *Id.* at CB App. 00020, CB App. 00046-47.  Pursuant to these rights, Benefuel issues a notice of pre-emptive rights to all investors, including Centerboard, giving the investors the right of first refusal if the

company proposes to offer for sale any new securities.  See *id.* at CB App. 00020.

The Investor Rights Agreement defines "new securities" as "equity securities of

[Benefuel], whether or not currently authorized, as well as rights, options, or warrants

to purchase equity securities, or securities of any type whatsoever that are, or may

become, convertible or exchangeable into or exercisable for such equity securities."

*Id.* at CB App. 00031.

Between December 2013 and December 2014, Centerboard contacted 400

equity investors and 25 debt investors on Benefuel's behalf.  Amended Complaint

¶ 23.  In June 2014, Suncor invested $10,000,000 in Benefuel, and, in exchange,

Suncor received 2 million shares of Benefuel.  *Id.* ¶ 28; Motion ¶ 19.  As a result of

this transaction, Benefuel paid Centerboard a work fee (cash) in the amount of

$15,000; a work fee (equity) in the amount of $105,000 at the Suncor transaction

price; and a success fee in the amount of $410,000 (calculated as 5% of $10,000,000

reduced by the work fee (cash) paid from December 2013 to May 2014 ($90,000)).

Amended Complaint ¶ 30.  At the same time, Flint Hills invested $1,000,000 in

Benefuel, $200,000 of which was related to the exercise of previously issued warrants,

and $800,000 of which was related to the exercise of its pre-emptive rights, such that

Flint Hills would maintain its pro rata equity ownership after the Suncor transaction.

*Id.* ¶ 29.  Centerboard did not invoice Benefuel for any amounts invested by Flint

Hills since -- pursuant to the agreement -- Centerboard was not entitled to a success

fee for either Flint Hill's exercise of previously issued warrants or Flint Hill's exercise of its pre-emptive right. *Id.* ¶ 31. Centerboard continued to invoice Benefuel for the monthly work fee (cash) and notified Benefuel that Centerboard was accruing the monthly work fee (equity), which CB contends was payable on a monthly basis due to the successful completion of the Suncor transaction. *Id.* ¶ 33.

In August 2014, Benefuel began pursuing alternative investment options with its existing shareholders, as it had not received sufficient equity investments to reach its capital targets. *Id.* ¶ 34. Centerboard assisted Benefuel's efforts by locating financing alternatives, providing detailed mezzanine financing analysis and illustrative term sheets, and preparing a draft term sheet for a mezzanine financing of roughly $30 million. *Id.* ¶¶ 34-42.

On December 1, 2014, Benefuel sent Centerboard written notice terminating the engagement agreement after December 2014. *Id.* ¶¶ 52-53. Under the engagement agreement, if Benefuel enters into a transaction during "the 12 month period following the date of termination (the "Tail Period"), Centerboard shall be entitled to a Success Fee as if the agreement were still in effect" if certain conditions are met. Centerboard's MSJ App. at CB App. 00016. "[U]nless at least $10,000,000 in Aggregate Consideration has been committed or funded prior to termination," Centerboard is only entitled to the success fee for transactions entered into during the tail period if "(i) Centerboard can demonstrate [the investors] became aware of the

Transaction through the efforts of Centerboard; or (ii) [the investors] were in discussions with [Benefuel] during the time [the engagement agreement] was in effect." *Id.*

On December 19, 2014, Benefuel and investors, led by FHR Treasury I, LLC ("FHR"), closed a $32,000,000 mezzanine transaction (hereinafter the "FHR mezzanine transaction" or "mezzanine transaction"). Amended Complaint ¶ 39; Motion ¶ 27. Prior to closing the mezzanine transaction, Benefuel issued a notice of pre-emptive rights to certain of its shareholders, including Centerboard, stating that the Section 4.1 of the Second Amended and Restated Investor Rights Agreement entitled Centerboard to participate in the 2015 transaction. Centerboard's MSJ App. at CB App. 00020. Benefuel received $27,150,000 from FHR and in exchange, Benefuel executed a secured promissory note in favor of FHR in the amount of $27,693,000, and Benefuel issued to FHR warrants for the purchase of 814,500 shares. Motion ¶ 27.

In its motion for summary judgment, Benefuel avers that Flint Hills invested in the mezzanine transaction. *Id.* ¶¶ 2, 3, 22, 27, 31, 33. Benefuel treats Flint Hills (Flint Hills Resources Renewables LLC) and FHR (FHR Treasury I, LLC) as identical entities, referring to both as FHR in its filings. Compare *id.* ¶ 2; *with* Defendant's Brief in Support of its Supplemental Motion for Summary Judgment ("Supplemental Motion") ¶ 2 (docket entry 117). Flint Hills and FHR are completely separate legal

and operating entities.  Centerboard's Sur-Reply Brief in Opposition to Defendant's

Motion for Summary Judgment and Supplemental Motion for Summary Judgment

("Centerboard's Sur-Reply") at 2-5 (docket entry 135) (citing Centerboard's

Appendix to its Sur-Reply in Opposition to Defendant's Motion for Summary

Judgment and Motion for Supplemental Motion for Summary Judgment

("Centerboard's Sur-Reply App.") at 045-48, 051 (docket entry 136)).  At the time

the engagement agreement was executed, Flint Hills was an investor in Benefuel,

while FHR was not.  Centerboard's Sur-Reply App at 046-48.  FHR was formed after

the engagement agreement was executed.  *Id.* at 051.  The two entities have separate

bank accounts, ledger accounts and financial score cards.  *Id.* at 045-46.  FHR, not

Flint Hills, invested in Benefuel through the mezzanine transaction.  *Id.* at 047.

On December 18, 2015, Benefuel executed a promissory note payable to FHR,

not Flint Hills, in the principal sum of $6,000,000 (the "2015 transaction").

Supplemental Motion ¶ 2.  Prior to executing the promissory note, Benefuel issued a

notice of pre-emptive rights to certain of its shareholders, including Centerboard,

stating that the Section 4.1 of the Second Amended and Restated Investor Rights

Agreement entitled Centerboard to participate in the 2015 transaction.

Centerboard's Supp. App. at CB App. 015.  On January 4, 2016, Benefuel filed a

Form D with the Securities and Exchange Commission in which it reported this

transaction.  Supplemental Motion ¶ 6.  On January 6, 2016, Centerboard invoiced Benefuel for $420,000 (7% of $6,000,000) related to this transaction.  *Id.* ¶ 7.

## B.  Procedural Background

On December 5, 2014, Centerboard filed this suit against Benefuel in the Supreme Court of the State of New York, County of New York.  *See generally* Amended Complaint (docket entry 1-1).  On January 7, 2015, Benefuel removed the case to the United States District Court for the Southern District of New York.  *See* Notice of Removal (docket entry 1).  On August 3, 2015, United States District Judge Paul A. Crotty transferred the case to this court (docket entry 25).

On January 21, 2016, Benefuel filed its motion for summary judgment (docket entry 39).  Centerboard filed a timely response (docket entry 55), to which Benefuel served a timely reply (docket entry 78).  On January 25, 2016, Centerboard filed an amended complaint adding facts and allegations (docket entry 44).  On May 16, 2016, after obtaining leave of court, Benefuel filed its supplemental motion for summary judgment (docket entry 117).  Centerboard filed a timely response (docket entry 121), to which Benefuel served a timely reply (docket entry 130).  After obtaining leave to file a sur-reply in opposition to Benefuel's motions (docket entry 1342), Centerboard filed a sur-reply in opposition to Benefuel's motions (docket entry 135).  Benefuel did not elect to file a sur-reply.  The motions are thus ripe for decision.

## II.  ANALYSIS

### A.  Motion for Summary Judgment Standard

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a), (c)(1).  A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham.").  To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in his favor.  *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  *Id.* at 255 (citing *Adickes*

*v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)).  However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact.  See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986).  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara*, 353 F.3d at 405.

## B.  Discussion

Benefuel contends that the court should grant its motion for summary judgment and dismiss all of Centerboard's claims with prejudice.  Motion at 13; Supplemental Motion at 8.  Benefuel asserts that Centerboard's breach of contract claims fail as a matter of law for several reasons.  First, Benefuel maintains that it did not breach the parties' engagement agreement because the FHR mezzanine transaction "did not trigger the payment of a work fee (equity) or success fee under the contract."  Motion ¶ 3.  Benefuel avers that the engagement agreement's definition of "transaction" explicitly limits the scope of the agreement to equity transactions, not debt transactions.  Motion ¶ 32.  Specifically, Benefuel contends that it does not owe Centerboard a work fee (equity) for July through December 2014

because the FHR mezzanine transaction -- allegedly a debt transaction -- did not

trigger the fee.  *Id.*  Also, Benefuel claims that it does not owe Centerboard a success

fee for the FHR mezzanine transaction because the FHR mezzanine transaction was a

debt transaction that did not increase FHR's pro rata equity ownership.  *Id.* ¶ 33.

Further, Benefuel urges that it does not owe Centerboard a success fee for the 2015

transaction because the engagement agreement does not govern debt transactions and

the 2015 transaction did not increase FHR's pro rata equity ownership.

Supplemental Motion ¶¶ 10-17.  Benefuel also contends that Centerboard is not

owed a success fee for the 2015 transaction because the transaction was executed

during the tail period, and Centerboard did not exert any effort in securing the

transaction, nor were the parties in discussions regarding the 2015 transaction when

the engagement agreement was in effect.  Defendant's Reply to Response to

Supplemental Motion for Summary Judgment ("Supplemental Reply") ¶¶ 12-15

(docket entry 130).

     In response, Centerboard asserts that the term transaction in the engagement

agreement covered all funding transactions, not just equity transactions.  Plaintiff's

Brief in Opposition to Defendant's Motion for Summary Judgment ("Opposition

Brief") at 7-9 (docket entry 56).  Centerboard insists that there is a genuine issue of

material fact as to whether the FHR mezzanine transaction is an equity transaction.

*Id.* at 9-11.  Centerboard avers that Benefuel's interpretation of the engagement

agreement -- requiring another successful closing of a transaction to trigger the work

fee (equity) -- is contrary to Delaware law.[1]  *Id.* at 11.  Even if the engagement

agreement requires another successful closing of a transaction, Centerboard claims the

FHR mezzanine transaction qualifies as one triggering the payment of the work fee

(equity).  *Id.* at 11-12.  Centerboard contends that there is a genuine issue of material

fact as to Benefuel's contractual obligation to pay the success fee under the agreement

for the FHR mezzanine transaction because FHR mezzanine transaction qualifies as a

transaction under the engagement agreement and that the FHR mezzanine

transaction increased its pro rata equity ownership.  *Id.* at 4-5, 12.  Centerboard avers

that it is owed a success fee for the FHR mezzanine transaction because FHR was not

a current investor at the time of the engagement agreement, and thus the pro rata

ownership clause does not apply to FHR's investment in Benefuel.  *See* Centerboard's

Sur-Reply at 2-5.  Further, Centerboard maintains that there is a genuine issue of

material fact as to Benefuel's contractual obligation to pay the success fee under the

agreement for the 2015 transaction because the 2015 transaction qualifies as a

transaction under the engagement agreement and that any investment by FHR is not

subject to the pro rata ownership clause.  Plaintiff's Brief in Opposition to

Defendant's Supplemental Motion for Summary Judgment ("Supplemental

Opposition Brief") at 2-6 (docket entry 122); Centerboard's Sur-Reply at 2-5.

---

[1]     The parties' engagement agreement expressly provides that Delaware law
governs this dispute.  *See* Centerboard's MSJ App. at CB App. 00016.

Additionally, Benefuel maintains that Centerboard's unjust enrichment and *quantum meruit* claims fail as a matter of law because as an "express contract covers the subject matter of the parties' dispute" there can be no recovery under an equitable theory.  Motion ¶¶ 35-40.  Centerboard responds that Benefuel cannot, on the one hand, contend that the agreement does not govern the FHR mezzanine transaction and, on the other, claim that a contract governs the subject matter of the parties' relationship so as to bar Centerboard from recovering under the theories of *quantum meruit* and unjust enrichment.  Opposition Brief at 12-14.

### 1. *Definition of Transaction under the Engagement Agreement*

Benefuel asserts that the parties' engagement agreement unambiguously defines a transaction and unambiguously limits the scope of the parties' agreement to equity transactions.  Motion ¶ 32.  The engagement agreement defines a transaction as "an investment in [Benefuel] or in another vehicle (including, but not limited to, Beatrice Funding, LLC) or through an extraordinary transaction with any of the foregoing to fund [Benefuel's] corporate development, and/or [the Beatrice project]."  Centerboard's MSJ App. at CB App. 00015.  Benefuel maintains that the term investment means "contribution of equity."  Motion ¶ 32.  Centerboard contends that "extraordinary transaction" is a "common investment banking term that is meant to be extremely broad and encompass all types of funding, debt, equity and hybrids, regardless of the form of the transaction."  Opposition Brief at 2.

- 14 -

When the issue before the court involves the interpretation of a contract,

summary judgment is appropriate only if the contract in question is unambiguous.

*Geoscan, Inc. of Texas v. Geotrace Technologies, Inc.*, 226 F.3d 387, 390 (5th Cir. 2000);

*United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

Therefore, the threshold inquiry when presented with a contract dispute on a motion

for summary judgment is whether the contract is ambiguous.  *Northwestern National*

*Insurance Company v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996).  Ambiguity does not

exist simply because the parties disagree about what the contract means.  *Id.* at 43;

*Seidensticker v. Gasparilla Inn, Inc.*, Civ. A. No. 2555-CC, 2007 WL 4054473, at *2

(Del. Ch. Nov. 8, 2007).  Moreover, extrinsic, parol evidence cannot be used to

manufacture an ambiguity in a contract that facially has only one reasonable

meaning.  *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232

(Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to

interpret the intent of the parties, to vary the terms of the contract or to create an

ambiguity.").  Rather, contracts are ambiguous "when the provisions in controversy

are reasonably or fairly susceptible of different interpretations or may have two or

more different meanings."  *Rhone-Poulenc Basic Chemicals Company v. American Motorists*

*Insurance Company*, 616 A.2d 1192, 1196 (Del. 1992).  Stated differently, to succeed

on its motion for summary judgment, Benefuel must establish that its construction of

the engagement agreement is the only reasonable interpretation.  See *Modern*

*Telecommunications, Inc. v. Modern Talking Picture Service*, Civ. A. No. 8688, 1987 WL

11286, at *3 (Del. Ch. May 27, 1987).  Guided by "Delaware's well-understood

principles of contract interpretation," *HIFN, Inc. v. Intel Corporation*, Civ. A. No.

1835-VCS, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007), the court concludes

that Benefuel has not succeeded in establishing that its interpretation of the disputed

engagement agreement is the only reasonable one.  Because the court concludes that

there are genuine issues of material fact and that the provisions are fairly susceptible

to at least two reasonable interpretations, the contract is ambiguous and summary

judgment is inappropriate.

 The engagement agreement's definition for transaction is far from clear.

Investment does not simply mean contribution of equity.  See, *e.g.*, *In re Nine Systems

Corporation Shareholders Litigation*, Civ. A. No. 3940-VCN, 2014 WL 4383127, at *6

(Del. Ch. Sept. 4, 2014) ("The equity investment proposal shared with [the investor]

shifted to a possible debt investment."), *aff'd sub nom.*, *Fuchs v. Wren Holdings, LLC*,

129 A.3d 882 (Del. 2015); *Finger Lakes Capital Partners, LLC v. Honeoye Lake

Acquisition, LLC*, Civ. A. No. 9742-VCL, 2015 WL 6455367, at *8 (Del. Ch. Oct. 26,

2015) (referencing both equity and debt investments).  Investment means an "outlay

of money usually for income or profit."  Investment, MERRIAM-WEBSTER'S

COLLEGIATE DICTIONARY 367-68 (10th ed. 1999); Investment, BLACK'S LAW

DICTIONARY 902 (9th ed. 2009) ("An expenditure to acquire property or assets to

produce revenue, a capital outlay.").  Benefuel's proposed definition of the term unduly restricts the term investment to equity investments, and nowhere in the agreement is transaction defined simply as an investment of equity in Benefuel. Buying a company's issued debt is an investment because the lender gives the company capital in hopes that the company will repay the lender at some future time with interest.  See, *e.g.*, *Greenwald v. Batterson*, Civ. A. No. 16475, 1999 WL 596276, at *2 (Del. Ch. July 26, 1999).  *Greenwald* is an example of an investor's purchase of "bonds with interest payable at the rate of 8% per year in cash, or additional debt, convertible to [the company's] stock."  Debt transactions structured like this are less risky investments than pure equity investments, but are investments nonetheless.

On the other hand, Centerboard cites no authority to support its contention that the term "extraordinary transaction" is a common banking term that encompasses all types of funding, including debt.  Opposition Brief at 2; Supplemental Opposition Brief at 2.  Therefore, the court cannot conclude that the term transaction unambiguously limits the engagement agreement to equity transactions or unambiguously includes debt transactions.  The definition of "transaction" includes vague terms that are simply not defined in the agreement. Both parties seek to have the court clarify the definition of transaction to serve their purposes.  The court will not do so at this juncture.  The definition of "transaction" is ambiguous because the term is susceptible to more than one reasonable

interpretation.  *Rhone-Poulenc Basic Chemicals Company*, 616 A.2d at 1196.  Benefuel

has failed to prove that there are no genuine issues of material fact and that the

engagement agreement unambiguously limits transactions to equity investments.

### 2.  *Work Fee (Equity) (Count I)*

Next, Benefuel contends that even if the engagement agreement applies to

non-equity transactions, it does not owe Centerboard the work fee (equity) because

the work fee (equity) is only due upon the successful completion of another

transaction.  Motion ¶ 32.  Benefuel insists that the work fee (equity) applies only to

equity transactions because it is "payable in equity at the Transaction price," which

implies that the fee is only relevant for equity transactions because "debt can have no

transaction price."  *Id.*  Centerboard avers that Benefuel's interpretation of the

engagement agreement -- requiring another successful closing of a transaction to

trigger the work fee (equity) -- is contrary to Delaware law and is an incorrect

interpretation of the agreement.  Opposition Brief at 11.  Even if the engagement

agreement requires another successful closing of a transaction, Centerboard claims,

the FHR mezzanine transaction qualifies as one, triggering the payment of the work

fee (equity).  *Id.* at 11-12.

The engagement agreement provides that Benefuel agrees to pay Centerboard

"[a]n additional work fee of $15,000 per month, payable in equity at the Transaction

price, and due upon successful completion of a Transaction."  Centerboard's MSJ

App. at CB App. 00015.  The provision for the work fee (equity) does not clearly require the close of an additional transaction.  The engagement agreement simply states that the fee is due upon the close of a transaction.  *Id.*  As discussed above, the term transaction is not limited to equity investments.  However, Benefuel correctly asserts that "payable in equity at the transaction price" implies that the fee is only relevant for equity transactions.  Motion ¶ 32 (citing Centerboard's MSJ App. at CB App. 00015).  It would be odd for the payment of the $15,000 per month fee to be in equity at the transaction price if the investment were solely a debt transaction.

In the FHR mezzanine transaction, Benefuel executed a secured promissory note in favor of FHR in the amount of $27,693,000, and Benefuel issued to FHR warrants for the purchase of 814,500 shares.  Motion ¶ 27.  The warrants are detachable from the note, and upon exercise, require Benefuel to "issue to the [w]arrantholder a certificate for the [c]ompany [s]hares purchased."  Benefuel's Appendix in Support its Motion for Summary Judgment at BF App. 000093 (docket entry 40-10).  The warrants have a ten year exercise period and automatically convert to equity prior to expiration without any action or payment on the part of the warrantholder.  *Id.* at BF App. 000094.  Benefuel maintains that the FHR mezzanine transaction is solely a debt transaction, not an equity transaction, yet Benefuel cites no authority for this assertion.  Motion ¶ 32.

Warrants, however, are not without question considered debt.  Under generally accepted accounting principles ("GAAP"), detachable warrants are equity instruments with value that must be included in the number of shares outstanding.  *See* Centerboard's Opp. Brief at 11 n.47.  The warrants at issue here are detachable.  *See* Centerboard's MSJ App. at CB App. 00023.  According to both Ernst & Young LP[2] and PricewaterhouseCooper LLP,[3] detachable warrants are considered equity under certain circumstances, and liabilities (debt) under other circumstances.  Benefuel does not attempt to explain why the warrants at issue are not equity.  *See generally* Motion; Defendant's Reply to Response to Motion for Summary Judgment ("Reply") ¶ 6 (docket entry 78).

In its supplemental motion for summary judgment and reply in support of its motion for summary judgment, Benefuel avers that the 2015 transaction constitutes a debt transaction -- not an equity transaction -- citing a multi-factor test courts consider when analyzing whether a security constitutes equity or debt to determine if a fraudulent transfer occurred in relation to bankruptcy.  *See* Defendant's Supp.

---

[2]        *Warrants on redeemable shares*, *Technical Line*, ERNST & YOUNG, No. 2009-16 at 5-6, October 21, 2009, file:///C:/Users/3918lc1/Downloads/technicalline_bb1844_financialinstruments_21october2009.pdf ("E&Y guideline").

[3]        *Financing transactions: debt, equity and the instruments in between*, 2nd ed. Mar. 2015, PRICEWATERHOUSECOOPER LLP, at 8-2, 8-7 - 8-8, https://www.pwc.com/us/en/cfodirect/assets/pdf/accounting-guides/pwc-guide-financing-transactions-debt-equity-second-edition-2015.pdf ("PwC guideline").

Motion ¶¶ 13-15 (citing *In re Color Tile, Inc.*, Civ. A. No. 96-76 (HSB), 2000 WL

152129, at *4 (D. Del. Feb. 9, 2000)); Supplemental Reply ¶¶ 3-4.  Courts use a

similar multi-factor test to determine whether a security is equity or debt under the

federal tax code.  See *Slappey Drive Industrial Park v. United States*, 561 F.2d 572, 581-

82 (5th Cir. 1977); 26 U.S.C.A. § 385.  Neither Benefuel nor Centerboard, however,

cites this test or any other test to support their respective positions that the

mezzanine transaction constitutes a debt or equity transaction.  *See generally* Motion;

Response.

        Whether the multi-factor test is applicable here or not, the test is a fact

intensive analysis that considers not only the underlying transaction, but the

economic reality surrounding the transaction.  *In re SubMicron Systems Corporation*,

432 F.3d 448, 455-56 and n.8 (3d Cir. 2006).  Since neither party offers any analysis

of the factors in relation to the FHR mezzanine transaction, the court will not *sua*

*sponte* analyze the factors in relation to the mezzanine transaction without assistance

from the parties.

        As the movant, Benefuel bears the burden to prove that there is no genuine

issue of material fact that Centerboard's claims should be dismissed.  *Celotex*

*Corporation*, 477 U.S. at 330.  Benefuel simply assumes that the mezzanine

transaction is a debt transaction, and that warrants are not equity.  Motion ¶ 32.

This assumption forms the basis of Benefuel's contention that it does not owe

Centerboard the work fee (equity).  See *id.*  In response, Centerboard showed that

there is a genuine issue of material fact that the warrants in the mezzanine

transaction constitute equity, and thus there is a genuine issue of material fact as to

whether Benefuel owes it the work fee (equity) for the relevant months.  Response at

9-11.  Benefuel has failed to prove that the warrants at issue in the FHR mezzanine

transaction are considered debt.  Therefore, if the definition of work fee (equity)

requires an additional equity transaction, there is a genuine issue of material fact as to

whether the FHR mezzanine transaction triggered the payment of the work fee

(equity) because the FHR mezzanine transaction can reasonably be classified as an

equity investment.  *Celotex Corporation*, 477 U.S. at 330.

The work fee (equity) for which Centerboard has made a claim arises out of the

Suncor transaction, not the FHR mezzanine transaction.  Amended Complaint ¶ 33,

at 16 (Prayer for Relief (a)).  Benefuel contends that since "no shares were issued" in

the FHR mezzanine transaction, no work fee (equity) is due because the FHR

mezzanine transaction does not have a closing price or transaction price.  Reply ¶ 6.

Benefuel's assertion incorrectly applies its interpretation of the work fee (equity) in

its motion for summary judgment.  In its motion for summary judgment, Benefuel

contends that it does not owe Centerboard the work fee (equity) on the Suncor

transaction because the FHR mezzanine transaction is a debt transaction, not an

equity investment.  Motion ¶ 32.  Yet, after Centerboard maintained that the FHR

mezzanine transaction is an equity transaction, Benefuel responded by averring that the work fee (equity) could not be paid to Centerboard as it pertains to the FHR mezzanine transaction because no shares have been issued.  Reply ¶¶ 5-6.  It is not the shares from the FHR mezzanine transaction for which Centerboard asserts a claim.  Centerboard asserted a claim for work fees (equity) from July to December 2014 from the Suncor transaction, not work fees (equity) from the FHR mezzanine transaction.  Amended Complaint ¶ 33, at 16 (Prayer for Relief (a)).

Benefuel contended that Centerboard is not due work fees (equity) because an additional transaction was needed to trigger the payment of work fees.  Reply ¶¶ 6-7.  As Centerboard argued, the engagement agreement does not clearly require this additional transaction.  *See* Centerboard's MSJ App. at CB App. 00015.  Centerboard argued that even if the engagement agreement required an additional transaction, the FHR mezzanine transaction constituted such a transaction.  Opposition Brief at 11-12.  Benefuel then cites certain emails to support its contention that the fee is not owed until the next issuance of stock.  Reply ¶ 7.  Given that Benefuel contends the engagement agreement is unambiguous, however, documents outside of the four corners of the engagement agreement can only be considered if the engagement agreement is ambiguous.  *United Rentals, Inc.*, 937 A.2d at 830 ("[T]he threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous."); *McAnulla Electrical Construction, Inc. v. Radius*

*Technologies, LLC*, Civ. A. No. N10C-03-076 PLA, 2010 WL 3792129, at *1 (Del. Super. Sept. 24, 2010) (denying summary judgment where "ambiguous and potentially conflicting provisions of the parties' contract present material disputes regarding their intent"); *Premcor Refining Group Inc. v. Matrix Service Industrial Contractors, Inc.*, Civ. A. No. 07C-01-095-JOH, 2008 WL 2232641, at *6 (Del. Super. Ct. May 7, 2008) ("Under Delaware Law, where, as here, the issue is contract interpretation, summary judgment is *only* appropriate where the contract is deemed unambiguous.") (emphasis in original), *appeal refused*, 950 A. 2d 659 (Del. 2008). If the engagement agreement is ambiguous, the fact finder must consider extrinsic evidence, and summary judgment is not proper. *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 784 (Del. 2012). Therefore, Benefuel cannot rely on to extrinsic evidence to prove the intent of the parties to support its motion for summary judgment because the agreement is either unambiguous and the court cannot rely on parol evidence, or the agreement is ambiguous, there is a genuine issues of material fact as to the parties' intent, and summary judgment is not proper. *Id.*; *Modern Telecommunications, Inc.*, 1987 WL 11286, at *3.

In short, the court is not convinced that the engagement agreement unambiguously prevents Centerboard's claim for work fees (equity) from July to December 2014 as a matter of law. First, the work fee (equity) provision is ambiguous because it is not clear whether the work fee is due upon the completion of

a transaction, is due for the months preceding or subsequent to the completion of a transaction, or is due upon an additional subsequent transaction. *See* Centerboard's MSJ App. at CB App. 00015. Second, there is a genuine issue of material fact as to whether the FHR mezzanine transaction is a transaction triggering the payment of the work fee (equity). Therefore, Benefuel's motion for summary judgment for Centerboard's claim for work fee (equity) from the Suncor transaction is denied.

### 3. *Success Fee (Pro Rata Equity) (Count II)*

Benefuel claims that it does not owe Centerboard a success fee for the FHR mezzanine transaction because the FHR mezzanine transaction was a debt transaction that did not increase FHR's pro rata equity ownership. Motion ¶ 33. Centerboard contends that there is a genuine issue of material fact as to Benefuel's contractual obligation to pay the success fee under the agreement for the FHR mezzanine transaction because the FHR mezzanine transaction qualifies as a transaction under the engagement agreement. Opposition Brief at 4-5, 12.

As the court concluded above, the engagement agreement does not unambiguously cover only equity transactions. Benefuel contends, nonetheless, that it does not owe Centerboard a success fee under the engagement agreement because the mezzanine transaction did not increase Flint Hills' pro rata equity ownership. Motion ¶ 33. Under the engagement agreement, "for current investors of [Benefuel] or any investment vehicle related to the Beatrice project, the 7% Success Fee will be

applied to only that Aggregate Investment which increases their pro rata equity ownership." Centerboard's MSJ App. at CB App. 00015. Benefuel is correct that the FHR mezzanine transaction did not increase Flint Hills' pro rata equity ownership. Benefuel is correct because Flint Hills did not participate in the FHR mezzanine transaction. Centerboard's Sur-Reply at 2-5; Centerboard's Sur-Reply App. at 045-48. FHR invested in the mezzanine transaction. Centerboard's Sur-Reply at 2-5; Centerboard's Sur-Reply App. at 045-48. FHR is not a current investor, as defined in the engagement agreement, because FHR was not an investor in Benefuel at the time the engagement agreement was executed, Centerboard's Sur-Reply App. 045-48, and did not even exist at the time the engagement agreement was executed. *Id.* at 045. The relevant clause does not apply to the FHR mezzanine transaction because FHR was not a current investor. See *id.* at 045-48, 51. Therefore, whether or not the FHR mezzanine transaction increased FHR's pro rata equity ownership is irrelevant to whether Centerboard is owed a 7% success fee on the FHR mezzanine transaction. *See* Centerboard's MSJ App. at CB App. 00015.

For these reasons, Benefuel's motion for summary judgment on Centerboard's claim for the 7% success fee on any increase in FHR's pro rata equity ownership is denied.

4. *2015 Promissory Note (Count III)*

Benefuel maintains that that summary judgment is proper on Centerboard's claim for a success fee on the 2015 transaction because the 2015 transaction does not qualify as a transaction under the engagement agreement and the 2015 transaction did not increase FHR's pro rata equity ownership.  Supplemental Motion ¶¶ 10-17. Further, Benefuel avers that the engagement agreement specifically excludes Centerboard from a success fee for this transaction during the tail period because Centerboard's efforts did not assist in securing the 2015 transaction, and the parties were not in discussions regarding the 2015 transaction during the time period the engagement agreement was in effect.  Supplemental Reply ¶¶ 12-15.  In response, Centerboard contends that there is a genuine issue of material fact as to Benefuel's contractual obligation to pay the success fee under the agreement for the 2015 transaction because the 2015 transaction qualifies as a transaction under the engagement agreement and because the 2015 transaction increased FHR's pro rata equity ownership.  Supplemental Opposition Brief at 2-6.

As the court concluded above, the engagement agreement does not unambiguously cover only equity transactions.  In its supplemental motion for summary judgment, *id.* ¶ 12, Benefuel maintains that the term transaction does not cover the 2015 transaction for the same reasons it contended that the transaction does not cover the FHR mezzanine transaction in its motion for summary judgment.

Motion ¶ 32.  Benefuel has failed to convince the court that its interpretation of the term transaction is the only reasonable interpretation of the term under the engagement contract.  *Rhone-Poulenc Basic Chemicals Company*, 616 A.2d at 1196.

In its reply, Benefuel -- for the first time -- contended that the engagement agreement specifically excludes Centerboard from a success fee for this transaction during the tail period because Centerboard's efforts did not assist in the securing of the 2015 transaction, and the parties were not in discussions regarding the 2015 transaction during the time period the engagement agreement was in effect.  Supplemental Reply ¶¶ 12-15.  Benefuel, however, misquotes the engagement agreement provision upon which it relies.  *See* Centerboard's MSJ App. at CB App. 016.  The conditions Benefuel relies on preclude Centerboard from receiving the success fee for a tail period transaction only if less than "$10,000,000 in Aggregate Consideration has been committed or funded prior to termination."  See *id.*  Through the Suncor transaction ($10,000,000), investors committed or funded at least $10,000,000 to Benefuel during the term of the engagement agreement prior to termination.  Amended Complaint ¶¶ 28-30.  Therefore, the conditions limited the applicability of the success fee for the 2015 transaction do not apply.

Benefuel contends that it does not owe Centerboard a success fee for the 2015 transaction for the same reason it contends that it does not owe Centerboard a success fee for the FHR mezzanine transaction -- that it did not increase Flint Hills'

pro rata equity ownership.  Supplemental Motion at 1.  Benefuel admits that Flint

Hills did not participate in the 2015 transaction.  *Id.* ¶ 2.  However, in its filings, it

used the same abbreviation for Flint Hills as it did for FHR, possibly to gull the court

and Centerboard into thinking it was the same entity.  See *id.*; Motion ¶ 2.  FHR, not

Flint Hills, participated in the 2015 transaction.  Centerboard's Sur-Reply at 2-5;

Centerboard's Sur-Reply App. at 045-48, 051.  Since FHR is not a current investor as

defined under the engagement agreement, whether or not the 2015 transaction

increased its pro rata equity ownership is irrelevant to whether Benefuel owes

Centerboard a success fee under the engagement agreement.

Therefore, Beneuel has failed to show there is no a genuine issue of material

fact that it does not owe Centerboard a success fee for the 2015 transaction.  *Celotex*

*Corporation*, 477 U.S. at 323-24; *H-W Technology, LC v. Overstock.com. Inc.*, 973

F. Supp. 2d 689, 692 (N.D. Tex. 2013) (Fish, J.), *aff'd as modified sub nom. H-W*

*Technology, L.C. v. Overstock.com, Inc.*, 758 F.3d 1329 (Fed. Cir. 2014).

### 5.  *Unjust Enrichment Claim (Counts IV and V)*

Benefuel maintains that Centerboard's unjust enrichment and *quantum meruit*

claims fail as a matter of law since an "express contract . . . covers the subject matter

of the parties' dispute" there can be no recovery under an equitable theory.  Motion

¶¶ 35-40.  Further, Benefuel avers that it did not receive any unjust benefit.  *Id.* ¶ 35.

In response, Centerboard maintains that Beneuel cannot, on the one hand, contend

that the agreement does not govern the FHR mezzanine transaction and, on the other

hand, claim that a contract governs the subject matter of the parties' relationship,

thus barring Centerboard from recovering under theories of *quantum meruit* and unjust

enrichment.  Opposition Brief at 12-14.  Also, Centerboard contends that it provided

significant financial advice and assistance to Benefuel for which it was not

compensated.  *Id.* at 12-13.

Under Delaware law, when an express or implied-in-fact contract covers the

subject matter of the parties' dispute, there can be no recovery under a theory of

unjust enrichment.  *Ameristar Casinos, Inc. v. Resorts International Holdings, LLC*, Civ. A.

No. 3685-VCS, 2010 WL 1875631, at *13 (Del. Ch. May 11, 2010); *Wal-Mart

Stores, Inc. v. AIG Life Insurance Company*, 872 A.2d 611, 620 (Del. Ch. 2005), *aff'd in

part, rev'd in part*, 901 A.2d 106 (Del. 2006); *MCG Capital Corporation v. Maginn*, Civ.

A. No. 4521-CC, 2010 WL 1782271, at *24-25 (Del. Ch. May 5, 2010).

Centerboard plead its unjust enrichment and *quantum meruit* claims in the alternative.

Amended Complaint ¶¶ 90-99.  Therefore, Centerboard contends that summary

judgment is not proper because if the court concludes that the engagement agreement

does not govern the FHR mezzanine transaction, then its claim that Benefuel was

unjustly enriched should stand.  *See* Opposition Brief at 12-14.

"If a contract comprehensively governs the parties' relationship, then it alone

must provide the measure of the plaintiff's rights and any claim of unjust enrichment

will be denied." *BAE Systems Information & Electronic Systems Integration, Inc. v. Lockheed Martin Corporation*, Civ. A. No. 3099-VCN, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009). "In some situations . . . both a breach of contract and an unjust enrichment claim may survive a motion to dismiss when pled as alternative theories of recovery." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, Civ. A. No. 7906-VCG, 2014 WL 6703980, at *27 (Del. Ch. Nov. 26, 2014). A plaintiff, however, cannot "use an unjust enrichment theory to rewrite a comprehensive contract governing the entirety of the parties' relevant relationship after finding disappointment in the resulting agreement." *BAE Systems Information & Electronic Systems Integration, Inc.*, 2009 WL 264088, at *8. "[I]f there is a contract between the complaining party and the party alleged to have been enriched unjustly, then the contract remains "the measure of [the] plaintiff's right." *MetCap Securities LLC v. Pearl Senior Care, Inc.*, Civ. A. No. 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007); see also *BAE Systems Information & Electronic Systems Integration, Inc.*, 2009 WL 264088, at *8.

Here, the relationship between Benefuel and Centerboard is expressly governed by the engagement agreement. *See* CB App. 00015. "Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract." *Bakerman v. Sidney Frank Importing Co., Inc.*, Civ. A. No. 1844-N, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006). Centerboard contends that summary judgment is

not proper because if the court concludes that the engagement agreement does not govern the FHR mezzanine transaction, then its claim that Benefuel was unjustly enriched should stand.  *See* Opposition Brief at 12-14.  Yet, a possible conclusion that the engagement agreement does not govern the FHR mezzanine transaction is contingent on an interpretation of the engagement agreement.  In *BAE Systems Information & Electronic Systems Integration, Inc.*, 2009 WL 264088, at *8, the plaintiff's alternative unjust enrichment claim was dismissed because a contract governed the parties relationship.  The court held that the plaintiff's claim "must succeed or fail entirely" on the breach of contract claim.  *Id.*

Whether the court concludes that Centerboard is owed a work fee (equity) or success fee on the FHR mezzanine transaction, the engagement agreement governs the parties' relationship.  Therefore, since a contract governs the parties' relationship, Centerboard's *quantum meruit* and unjust enrichment claims fail as a matter of law. *BAE Systems Information & Electronic Systems Integration, Inc.*, 2009 WL 264088, at *7; *Wal-Mart Stores, Inc.*, 872 A.2d at 620.  Benefuel's motion for summary judgment on Centerboard's claims for unjust enrichment (Count IV) and *quantum meruit* (Count V) is granted.

In its supplemental motion for summary judgment, Benefuel contends that Centerboard's *quantum meruit* and unjust enrichment claims fail as a matter of law. *See* Benefuel's Supp. Motion ¶¶ 18-23.  In its response, Centerboard maintains that it

never asserted a claim for *quantum meruit* or unjust enrichment related to the 2015 transaction.  *See* Plaintiff's Brief in Opposition to Defendant's Supplemental Motion for Summary Judgment at 6 (docket entry 122).  Centerboard only asserts claims for unjust enrichment and *quantum meruit* in connection with the mezzanine transaction.  *See* Amended Complaint ¶¶ 91, 96.  Therefore, Benefuel's motion for summary judgment on a claim that Centerboard never made is denied as moot.

III.  <u>CONCLUSION</u>

For the reasons stated above, Benefuel's motion for summary judgment on Centerboard's breach of contract -- work fee (equity) claim (Count I) and Centerboard's breach of contract -- mezzanine transaction claim (Count II) is **DENIED**, Benefuel's motion for summary judgment on Centerboard's unjust enrichment claim (Count IV) and *quantum meruit* claim (Count V) is **GRANTED**, Benefuel's supplemental motion for summary judgment on Centerboard's breach of contract -- 2015 transaction claim (Count III) is **DENIED**, and Benefuel's supplemental motion for summary judgment on Centerboard's unjust enrichment and *quantum meruit* claim for the 2015 transaction is **DENIED** as moot.

**SO ORDERED**.

June 29, 2016.

A. JOE FISH
**A. JOE FISH**
**Senior United States District Judge**