UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CENTERBOARD SECURITIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:15-CV-2611-G |
| BENEFUEL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION**

## I.  INTRODUCTION

This action was brought by the plaintiff, Centerboard Securities, LLC

("Centerboard"), against the defendant, Benefuel, Inc. ("Benefuel"), for breach of

contract.  Following a bench trial concluding on October 7, 2016, the court makes

the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

1.     Benefuel is an alternative energy company focused on producing fuels,

lubricants, and chemicals derived from non-food related fats and oils through a

proprietary chemical process derived from a process known as the "Ensel technology." Trial Transcript, Vol. I, 8:14-19 (docket entry 194).

2.      Benefuel's chairman is Thomas Ryley ("Ryley") and its chief executive officer is Robert Tripp ("Tripp").  Trial Transcript, Vol. II, 136:20, 25 (docket entry 195).

3.      Centerboard is a broker dealer registered with the Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority, Inc.  Trial Transcript, Vol. I, 9:21-23; Plaintiff Centerboard's Post-Trial Brief ("Centerboard's Brief") at 1 (docket entry 199).

4.      In January 2011, Benefuel entered into a joint venture with Flint Hills Resource Renewables, LLC ("Flint Hills") to develop biodiesel production capabilities, including retrofitting the Beatrice Nebraska biodiesel plant (the "Beatrice project") for operation.  *See* PTE 151 at CBO 34723; Trial Transcript, Vol. III, 41:17-42:24 (docket entry 196).

5.      On October 14, 2013, Centerboard and Benefuel began discussing a possible engagement agreement.  *See* Trial Transcript, Vol. I, 48:3-12.

6.      On October 21, 2013, Centerboard emailed an initial outline of its proposed terms of engagement to Benefuel.  *See id.* at 48:14-16; PTE 2; DTE 1.

7.     In the initial outline, Centerboard indicated that its fee would include a monthly retainer of $30,000 and a success fee of 7% of the capital funding.  PTE 2; DTE 1.

8.     On November 2, 2013, Centerboard emailed an initial draft of the engagement letter to Benefuel. PTE 3; DTE 2; Trial Transcript, Vol I, 54:22-55:11.

9.     On November 6, 2013, Benefuel emailed Centerboard its comments on the engagement letter's terms.  PTE 6; DTE 2B; Trial Transcript, Vol I, 55:15-16.

10.     Furthermore, on November 6, 2013, upon reviewing the draft, Ryley expressed to Centerboard member Michael Maloney ("Maloney") that Benefuel's goal was raising equity investment of approximately $30 million.  DTE 2B.  In addition, Ryley stated that the scope of the engagement should be "[T]ied at this point to the issuance of equity by Benefuel, as that is the current intention.  If [Benefuel] were subsequently to do issuance of other forms of finance, or enter into other venture financing structures, these should be the subject of separate engagement agreements."  DTE 2B.

11.     On November 10, 2013, Tripp and Ryley had further email exchanges regarding the terms of Centerboard's engagement and Ryley provided his comments to Tripp on the outstanding points.  *See* PTE 8; DTE 6.

12.     Later in the day on November 10, 2013, following the email exchanges between Tripp and Ryley, Tripp emailed Centerboard with additional comments on the engagement letter.  *See* PTE 9; Trial Transcript, Vol. II, 152:9-16.

13.     Following subsequent negotiations over the engagement letter's terms, on November 12, 2013, negotiations ceased.  Trial Transcript, Vol. I, 67:10-16.

14.     On November 15, 2013, Centerboard and Benefuel renewed their discussions regarding the engagement and Centerboard emailed Benefuel its position on Benefuel's outstanding comments on the engagement letter.  *See* PTE 10; DTE 7.

15.     On November 18, 2013, Centerboard emailed Benefuel a redlined draft of the engagement letter adding language that the monthly equity component of the work fee would be "payable in equity at the Transaction price and due upon successful completion of a Transaction."  *See* PTE 11; DTE 8.

16.     Furthermore, Maloney included the following language:  "In the event the Aggregate Investment is provided by Suncor, SilverLake, Black Corral or CHS, the success fee will be reduced to 5% of any Aggregate Investment.  Further, for current investors, the 7% Success Fee will be applied to only that Aggregate Investment which increases their pro rata equity ownership."  PTE 11; DTE 8.

17.     On November 21, 2013, Benefuel deleted language from the draft engagement letter which defined an investment as including debt.  PTE 12; DTE 9.  Specifically, Benefuel deleted the following language:  "convertible securities, and

joint venture arrangements in lieu of a direct Company investment."  PTE 12; DTE 9.

18.     Benefuel's November 21st redline draft of the engagement letter included "preferred stock" in an attempt to limit the engagement to the raising of equity.  *See* PTE 12; DTE 9; Trial Transcript, Vol. I, 149:22-24, 150:7-19.

19.     On November 25, 2013, Centerboard emailed Benefuel a redlined draft of the engagement letter.  *See* PTE 13; DTE 10.  Centerboard's redlined draft rejected Benefuel's attempt to limit the engagement to the raising of equity by deleting the words "preferred stock."  *See* DTE 10; PTE 13; Trial Transcript, Vol. II, 161:1-8.

20.     On November 26, 2013, Centerboard member Lee Eichen ("Eichen") added the term "extraordinary transaction" to the engagement letter.  DTE 11.

21.     The final signed engagement letter agreement is dated December 1, 2013 ("the agreement").  *See* PTE 15; DTE 13.

22.     The agreement called for Centerboard to act as a financial advisor to Benefuel and to provide Benefuel with "financial advice and assistance in connection with a Transaction, including:  (i) identifying and contacting potential investors and/or strategic partners; (ii) assisting [Benefuel] in its consideration and analysis of a Transaction; and (iii) assisting [Benefuel] in its negotiation of the financial aspects of a Transaction."  *See* PTE 15; DTE 13.

23.     The agreement defines "Transaction" as "an investment in [Benefuel] or in another vehicle (including, but not limited to, Beatrice Funding, LLC) or through an extraordinary transaction with any of the foregoing to fund [Benefuel's] corporate development and/or the Beatrice, Nebraska biodiesel project." *See* PTE 15; DTE 13; Trial Transcript, Vol. I, 90:1-7.

24.     The agreement does not specify that the engagement is limited to equity transactions.  PTE 15; DTE 13.

25.     Pursuant to the agreement, Benefuel agreed to pay Centerboard two forms of compensation:  (1) a work fee; and (2) a success fee.  *See* PTE 15; DTE 13.

26.     The work fee is comprised of two components:  a cash component of $15,000 per month ("work fee (cash)") and an equity component of $15,000 per month ("work fee (equity)"), payable in equity at the Transaction price and due upon successful completion of a Transaction.  *See* PTE 15; DTE 13.

27.     The success fee is defined as 7% of any Aggregate Investment and is "payable in cash at the time cash proceeds of such Investment are received (reduced by the amount of the cash work fee paid)."  *See* PTE 15; DTE 13.

28.     "Aggregate Investment" is defined as "the total amount of all investments received in connection with a Transaction and shall include any amounts committed during the term of this Agreement or during the Tail Period and funded

subsequent to the expiration of this Agreement."  PTE 15; DTE 13; Trial Transcript, Vol. I, 114:6-11.

29.    The 7% success fee is reduced from 7% to 5% for any investment by "any of Hercules Technology Growth Capital, Suncor Energy Inc., SilverLake Management LLC, Black Corral Capital or CHS Inc. or the affiliates of each of the foregoing."  PTE 15; DTE 13.

30.    The 5% clause applies to affiliates of the named entities.  *See* PTE 15; DTE 13.

31.    For investments by "current investors" of Benefuel or any investment vehicle related to the Beatrice project, the 7% success fee applies "to only that Aggregate Investment which increases their pro rata equity ownership" (the "pro rata ownership clause").  *See* PTE 15; DTE 13.

32.    The term "current investor" is not defined in the agreement.  *See* PTE 15; DTE 13.

33.    As of the date of the agreement, December 1, 2013, Flint Hills was an investor in Benefuel and was listed on Benfuel's stock register.  PTE 16; DTE 12.

34.    FHR Treasury I, LLC ("FHR") was formed as a Delaware limited liability company on June 20, 2014, more than six months after Centerboard and Benefuel executed the agreement.  PTE 136.

35.     At the time Centerboard and Benefuel executed the agreement, FHR was not an investor of Benefuel and was not listed on Benefuel's stock register.  PTE 16; DTE 12; Trial Transcript, Vol. III, 37:8-15.

36.     The agreement did not extend the pro rata ownership clause to affiliates of current investors.  PTE 15; DTE 13; Trial Transcript, Vol. I, 96:22-25.

37.     The agreement included a provision that Benefuel did not owe Centerboard a success fee for "the exercise of currently outstanding warrants or the equity issued upon conversion of currently outstanding convertible debt" or any investment into the Beatrice project that might arise out of Benefuel's current discussions with investors.  PTE 15; DTE 13.

38.     The agreement also provided for a tail period of twelve months following the date of termination.  PTE 15; DTE 13.

39.     For any Transaction entered into by Benefuel during the tail period, "Centerboard shall be entitled to a Success Fee as if this Agreement were in effect; PROVIDED THAT, unless at least $10,000,000 in Aggregate Consideration has been committed or funded prior to termination, compensation under this clause 3 (b) shall be applicable only to parties that:  (i) Centerboard can demonstrate became aware of the Transaction through the efforts of Centerboard; or (ii) were in discussions with [Benefuel] during the time this Agreement was in effect."  PTE 15; DTE 13.

40.    The agreement required 30 days' written notice for termination to be effective.  PTE 15; DTE 13.

41.    Benefuel provided written notice of termination of the agreement on December 1, 2014.  *See* PTE 92.

42.    The agreement terminated on December 31, 2014.  PTE 15, 92; DTE 13; Trial Transcript, Vol. III, 89:4-6.

43.    The tail period was from January 1, 2015, to December 31, 2015.  PTE 15; DTE 13.

44.    Prior to the termination of the agreement, on June 5, 2014, Benefuel entered into a series of transactions with various investors, including the sale of 2,000,000 shares of series C preferred stock to Suncor Energy (U.S.A.), Inc., a wholly owned subsidiary of Suncor Energy, Inc., in exchange for $10,000,000 ("Suncor Transaction").  PTE 32; Trial Transcript, Vol. I, 200:22-201:8.

45.    At the time of the Suncor Transaction, Suncor Energy (U.S.A.), Inc. was a new investor to Benefuel.  *See* PTE 16; DTE 12.

46.    Centerboard did not introduce Suncor Energy, Inc. or Suncor Energy (U.S.A.), Inc. to Benefuel.  *See* Trial Transcript, Vol. I, 201:10-14.

47.    Centerboard participated in the Suncor Transaction by performing financial analysis for Benefuel.  PTE 27; DTE 33; Trial Transcript, Vol. I, 201:21-202:4.

48.     At the time of the Suncor Transaction, Benefuel had paid the $15,000 monthly work fee (cash) to Centerboard from December 2013 to May 2014, for a total of $90,000.  PTE 34.

49.     Because Suncor Energy (U.S.A.), Inc., an affiliate of Suncor Energy, Inc., made the investment in Benefuel, the success fee was reduced from 7% to 5%, *i.e.*, from $700,000 (7% of $10,000,000) to $500,000 (5% of $10,000,000) pursuant to the terms of the agreement.  *See* PTE 15, 34; DTE 13.

50.     The $90,000 in work fee (cash) previously paid for December 2013 to May 2014 was credited against the success fee due as a result of the Suncor Transaction.  *See* PTE 34.

51.     Upon closing the Suncor Transaction, Benefuel paid to Centerboard $410,000 (success fee of $500,000 less $90,000 in work fee (cash) previously paid). *See* PTE 34.  Also upon closing the Suncor Transaction, Benefuel delivered to Centerboard a stock certificate for 21,000 shares of series C preferred stock as payment for the work fee (equity) from December 2013 to June 2014.  *See* PTE 38.

52.     In September 2014, Benefuel began discussions about a mezzanine investment.  *See* Trial Transcript, Vol I, 197:10-13, 198:16-20.

53.     Centerboard assisted Benefuel in its consideration and analysis of a potential mezzanine financing of roughly $30 million and assisted Benefuel in its

negotiation of the financial aspects of the transaction.  *See* PTE 49; Trial Transcript, Vol. I, 200:13-17.

54.     On October 28, 2014, Kevin Singer ("Singer") from Centerboard and Ryley from Benefuel had a conference call to discuss the success fee payable to Centerboard for the upcoming mezzanine financing.  PTE 68, 69; Trial Transcript, Vol. I, 204:10-14.

55.     On December 19, 2014, Benefuel entered into a note purchase and warrant agreement with various purchasers for the principal amount of $32,000,000 ("FHR mezzanine transaction").  *See generally* PTE 101.

56.     The FHR mezzanine transaction consisted of the issuance of units comprised of secured promissory notes and warrants.  PTE 101; Trial Transcript, Vol. II, 14:4-18.  The units were hybrid securities with aspects of debt and aspects of equity.  Trial Transcript, Vol. II, 14:19-24.

57.     The warrants are detachable, have an exercise price equal to $0.01 per share of common stock and automatically convert to equity upon expiration, if not previously exercised, or if Benefuel filed bankruptcy or paid off the mezzanine loan. *See generally* PTE 10, 103.

58.     FHR was the primary purchaser in the FHR mezzanine transaction, purchasing units for a note in the amount of $27,150,000 and receiving warrants for 814,500 shares of common stock.  PTE 101; Trial Transcript, Vol. II, 20:16-18.

59.     FHR Treasury is a separate legal and operating entity from Flint Hills. *See* PTE 136.

60.     Benefuel has refused to pay Centerboard any success fee for the FHR mezzanine transaction.  Centerboard's Brief at 10.

61.     As to the dispute over the work fee (equity), the completion of the Suncor Transaction met the condition in the tail period provision requiring at least $10,000,000 in aggregate consideration to have been committed or funded prior to termination.  *See* PTE 15; DTE 13.

62.     On July 18, 2014, Centerboard emailed Benefuel an invoice for the work fee (cash) for July 2014 and informed Benefuel that the work fee (equity) for July 2014 was still accruing.  PTE 43, 44.

63.     On December 7, 2015, Benefuel's board of directors approved a $6,900,000 offering of convertible promissory notes and invited its shareholders to participate.  *See* PTE 126.

64.     On December 18, 2015, Benefuel executed a convertible promissory note payable to FHR in the principal amount of $6,000,000 ("2015 transaction"). DTE 121; Trial Transcript, Vol. III, 25:18-20.

65.     The 2015 transaction closed during the tail period.  *See* PTE 15; DTE 13.

66.     The 2015 transaction was a convertible promissory note and had both

debt and equity features.  PTE 123; Trial Transcript, Vol. I, 116:15-18.

67.     Flint Hills did not invest in the 2015 transaction; rather, FHR invested

in the 2015 transaction.  *See generally* PTE 127, 128.

68.     Benefuel has refused to pay Centerboard any success fee for the 2015

transaction.  Centerboard's Brief at 11.

III.  <u>ANALYSIS</u>

A.  <u>Legal Standards</u>

1.  *Breach of Contract*

Delaware law governs this dispute.  See *Resolution Trust Corporation v. Northpark

Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (holding that a "federal court is

required to follow the choice of law rules of the state in which it sits. . . . [U]nder the

Texas rules, in those contract cases in which the parties have agreed to an enforceable

choice of law clause, the law of the chosen state must be applied"), *cert. denied*, 506

U.S. 1048 (1993); *see also* PTE 15; DTE 13.  "Under Delaware law, the elements of a

breach of contract claim are:  (1) a contractual obligation; (2) a breach of that

obligation by the defendant; and (3) a resulting damage to the plaintiff."  *H-M

Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *Connelly v. State Farm

Mutual Automobile Insurance Company*, 135 A.3d 1271, 1280 n.28 (Del. 2016).

Delaware strictly adheres to the objective theory of contract interpretation. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). Under that theory, "a contract's construction should be that which would be understood by an objective, reasonable third party." *Id.* When a term's definition is not altered or has "no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning." *Lorillard Tobacco Company v. American Legacy Foundation*, 903 A.2d 728, 740 (Del. 2006) (quoting *USA Cable v. World Wrestling Federation Entertainment, Inc.*, 766 A.2d 462, 474 (Del. 2000)).

### 2. *Parol Evidence Rule*

The parol evidence rule bars admission of extrinsic evidence to contradict or vary unambiguous terms. *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012). Ambiguity does not exist simply because the parties disagree about a term's construction. *Seidensticker v. Gasparilla Inn, Inc.*, Civ. A. No. 2555-CC, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007). Moreover, courts will not "destroy or twist" contract language to find an ambiguity when its meaning is evident from the general nature of language. *Rhone-Poulenc Basic Chemicals Company v. American Motorists Insurance Company*, 616 A.2d 1192, 1195-96 (Del. 1992). Contracts are ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.* at 1196. The court must review the agreement for ambiguity through

the lens of "what a reasonable person in the position of the parties would have thought [the contract] meant." *Id.* at 1197.

## B. Application of the Law

Centerboard asserts three claims for breach of contract:  (1) for the work fee (equity) (Count I) from July 2014 through December 2014; (2) for the success fee for the FHR mezzanine transaction (Count II); and (3) for the success fee for the 2015 transaction (Count III).  Centerboard's Amended Complaint Against Benefuel ¶¶ 69-89 (docket entry 44).  Counts II and III depend on whether the FHR mezzanine transaction and 2015 transaction fall within the agreement's definition of "Transaction."  If the court determines that the FHR mezzanine transaction and/or the 2015 transaction are "Transactions," then calculation of the appropriate success fee depends on whether FHR was a "current investor" under the agreement. However, the court must first determine whether the terms "Transaction" and/or "current investor" are ambiguous.  If the terms are ambiguous, parol evidence may be considered to aid the court in its interpretation.

Lastly, as to Count I, the court must determine whether Centerboard is entitled to a work fee (equity) under the agreement.

### 1. *Count II and Count III*

#### a. The FHR Mezzanine Transaction and the 2015 Transaction
#### Are "Transactions" as Defined in the Agreement

The agreement defines "Transaction" as "an investment in [Benefuel] or in another vehicle (including, but not limited to, Beatrice Funding, LLC) or through an extraordinary transaction with any of the foregoing to fund [Benefuel's] corporate development and/or the Beatrice, Nebraska biodiesel project." *See* PTE 15; DTE 13. Accordingly, the court must determine whether the terms "investment" and/or "extraordinary transaction" are ambiguous and then construe each term.

The court will begin by looking to the dictionary definition of "investment." See *Lorillard Tobacco Company*, 903 A.2d at 740. "Investment" is defined as an "outlay of money usually for income or profit." Investment, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 616 (10th ed. 1999); Investment, BLACK'S LAW DICTIONARY 902 (9th ed. 2009) ("An expenditure to acquire property or assets to produce revenue; a capital outlay."). Benefuel contends that it is reasonable to restrict the term "investment" solely to equity investments; therefore, the term "investment" is ambiguous. Defendant Benefuel's Closing Argument Brief ("Benefuel's Brief") at 2 (docket entry 198). Centerboard contends that the term "investment" is broad and includes both debt and equity investments. *See* Centerboard's Brief at 14-15.

Here, the term "investment" is not reasonably susceptible to Benefuel's proposed definition.[1] See *Seaford Golf & Country Club v. E.I. duPont de Nemours & Company*, 925 A.2d 1255, 1261-62 (Del. 2007) (looking to whether the term is susceptible to the interpretation of one of the parties to determine ambiguity). First, Benefuel's interpretation cannot be reconciled with the dictionary definition of the word "investment." An "outlay of money usually for income or profit" does not remotely limit the specific types of financing that constitute an "investment." Although the dictionary definition of "investment" is broad, breadth does not render a term ambiguous. *Levitt Corp. v. Office Depot, Inc.*, No. CIV.A. 3622-VCN, 2008 WL 1724244, at *5 (Del. Ch. Apr. 14, 2008) ("[T]here is a difference between breadth and ambiguity.").

---

[1]     The court's order denying Benefuel's motion for summary judgment states, "The engagement agreement's definition for transaction is far from clear." Memorandum Opinion and Order Granting in Part and Denying in Part Benefuel's Motion and Supplemental Motion for Summary Judgment at 16 (docket entry 139). Benefuel cites this sentence for the proposition that the term "Transaction" is ambiguous. Benefuel's Brief at 2. However, the court is not bound by its summary judgment order. Where a court denies a motion for summary judgment, "the order establishes nothing as the facts and all issues made by the pleadings are open at trial." *United States v. Horton*, 622 F.2d 144, 148 (5th Cir. 1980) (quoting 6 J. MOORE'S FEDERAL PRACTICE § 56.04(1) (1975)). In the quotation cited by Benefuel, the court implied that Benefuel had not met its summary judgment burden of showing that the term "Transaction" was limited to equity. However, it made no ultimate determination on whether the term is facially ambiguous. Therefore, the order is not controlling on this issue.

The plain meaning of the word "investment" clearly includes debt transactions. For example, buying a company's issued debt is an "outlay of money" because the lender gives the company capital in hopes that the company will repay the lender at some future time with interest.  See, *e.g.*, *Greenwald v. Batterson*, Civ. A. No. 16475, 1999 WL 596276, at *2 (Del. Ch. July 26, 1999).  *Greenwald* is an example of an investor's purchase of "bonds with interest payable at the rate of 8% per year in cash, or additional debt, convertible to [the company's] common stock."  Debt transactions structured like this are presumably less risky than pure equity investments but, under the dictionary definition, are investments nonetheless.

Furthermore, examining the term "investment" from the lens of a reasonable person in the parties' positions only supports the conclusion that "investment" includes both debt and equity.  The parties are both sophisticated business entities, and both were represented by counsel.  *See* Trial Transcript, Vol. I, 73:6-12.  If the parties had intended for the term "investment" to only include equity, they were more than capable of drafting the agreement to reflect such an intention.  They opted not to, however, in the final agreement.  Because the parties agreed to use the expansive term "investment," Centerboard's broad interpretation of the word "investment" is the "superior interpretation."  See *Wills v. Morris, James, Hitchens &* *Williams*, No. CIV. A. 15297, 1998 WL 842325, at *2 (Del. Ch. Nov. 6, 1998) (looking to the "superior" interpretation of the parties' offered interpretations);

*Cornell Glasgow, LLC v. LaGrange Properties, LLC*, No. CIV.A. N11C-05-016-JRS, 2012 WL 6840625, at *12 (Del. Super. Ct. Dec. 7, 2012) (looking to the "more reasonable" interpretation of the parties' offered interpretations).  Given the breadth of the term "investment," limiting its application solely to equity transactions is incongruous.

Moreover, Delaware courts use the word "investment" to refer to both debt and equity.  See, *e.g.*, *In re Nine Systems Corporation Shareholders Litigation*, No. Civ. A. 3940-VCN, 2014 WL 4383127, at *6 (Del. Ch. Sept. 4, 2014) ("The equity investment proposal shared with [the shareholder] shifted to a possible debt investment"), *aff'd sub nom.*, *Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015); *Greenwald*, 1999 WL 596276, at *2 (noting that "investment" included purchase of bonds or debt convertible to company stock).  Thus, the court holds that the term "investment" is not ambiguous and parol evidence should not be considered.  *Allied Capital Corporation v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (holding that only after determining that a contractual provision is ambiguous can the court consider extrinsic evidence in interpreting such a provision).

Even if it is assumed *arguendo* that the term "investment" is ambiguous, thus allowing extrinsic evidence to be considered, Benefuel's interpretation would still fail. Under Delaware law, where there is an ambiguous provision in a negotiated bilateral agreement, extrinsic evidence should be considered if it would help the court

interpret such a provision.  *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d

1228, 1232-33 (Del. 1997).  Delaware courts may consider all admissible evidence

relating to the objective circumstances of the contract's formation.  See *Salamone v.*

*Gorman*, 106 A.3d 354, 374 (Del. 2014).  Sources of such evidence include "overt

statements and acts of the parties, the business context [of the contract], prior

dealings between the parties, business custom, and usage in the industry."  *Dittrick v.*

*Chalfant*, 948 A.2d 400, 406 (Del. Ch.) (quoting *The Liquor Exchange, Inc. v. Tsaganos*,

No. Civ. A. 19312-NC, 2004 WL 2694912, at *2 (Del. Ch. Nov. 16, 2004)), *aff'd*,

935 A.2d 255 (Del. 2007).

Here, the parties presented prior drafts of the agreement.  The drafts show that

the term "investment" was, at times, clearly limited to equity.  For example,

Benefuel's additions to the November 21, 2013 version of the agreement limited

investment to "preferred stock of the Company."  Trial Transcript, Vol. I, 74:22-75:4;

DTE 9.  However, in the final version of the agreement, the parties opted for broad

language -- the word "investment" -- without any limitations.  The final agreement

does not support the notion that investment is limited to equity.  See *T.P. Inc. v.*

*J&D's Pets, Inc.*, No. 98C-01-205-WTQ, 1999 WL 135243, at *5 (Del. Ch. Feb. 26,

1999) (holding that a subsequently-removed clause included in prior drafts does not

evidence an intent to agree to the clause in the final draft); *Emmons v. Hartford*

*Underwriters Insurance Company*, 697 A.2d 742, 746 (Del. 1997) ("Contract

interpretation that adds a limitation not found in plain language of the contract is untenable."). Even considering the extrinsic evidence, the court cannot hold that the deletion of Benefuel's restrictive language did not reflect the parties intentions at the time of the final agreement. *American Family Mortgage Corporation v. Acierno*, No. CIV. A. 91C-09-214, 1993 WL 259113, at *1 (Del. Super. Ct. July 7, 1993) ("The Court is not free to ignore the language in the agreement."), *aff'd*, 640 A.2d 655 (Del. 1994).

Moreover, extrinsic evidence shows that Benefuel apparently understood the term "investment" to broadly include both equity and debt. Both the note and purchase agreement for the FHR mezzanine transaction and the promissory note for the 2015 transaction define "investment" as including both equity and debt. *See* PTE 101 at Benefuel000053; PTE 127 at FHR 5864. While Benefuel has presented some evidence that equity investments were its preferred source of funding, the court must adhere to the objective theory of contract law. *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) ("The Court must emphasize here that the introduction of extrinsic, parol evidence does not alter or deviate from Delaware's adherence to the objective theory of contracts."). Considering the plain meaning of the term "investment," the fact that the parties were two sophisticated business entities, and that the clause was highly negotiated, the court holds that the term

"investment" encompasses both equity and debt.[2]  Therefore, the FHR mezzanine

transaction and the 2015 transaction fall within the term "Transaction" under the

agreement.

### b.  FHR Is Not a Current Investor under the Agreement

The court must further construe the agreement to determine whether a success

fee is owed on the FHR mezzanine and 2015 transactions.  Centerboard contends

that it is owed a success fee pursuant to the following clause in the agreement:

> A success fee of 7% of any Aggregate Investment, payable
> in cash at the time cash proceeds of such Investment are
> received (reduced by the amount of the cash work fee
> paid).  For purposes hereof, Aggregate Investment shall
> mean the total amount of all Investments received in
> connection with a Transaction and shall include any
> amounts committed during the term of this Agreement or
> during the Tail Period and funded subsequent to the
> expiration of this agreement.

PTE 15; DTE 13.

Benefuel contends, however, that the following clause applies:  "For current

investors of the Company . . ., the 7% Success Fee will be applied to *only that*

*Aggregate Investment which increases their pro rata equity ownership*."  *See* PTE 15; DTE 13

(emphasis added).  Specifically, Benefuel contends, FHR is a "current investor" under

the agreement because it is part of the Koch family and the Koch family had already

---

[2]      Because the court has determined that the term "investment"
encompasses both debt and equity, it need not construe the term "extraordinary
transaction."

invested in Benefuel through Flint Hills.  Benefuel's Brief at 5, 7.  Benefuel concludes, therefore, that, at most, it owes the amount that Flint Hills increased its pro rata equity ownership through FHR's investment.  *See* Benefuel's Brief at 8-9.

First, the court must determine whether the term "current investor" is ambiguous.  "Current" is defined as "presently elapsing" or "occurring in or existing at the present time."  Current, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 284 (10th ed. 1999).  "Investor" is defined as "*[a] buyer* of a security or other property who seeks to profit from it without exhausting the principal" or "[b]roadly, *a person* who spends money with an expectation of earning a profit."  Investor, BLACK'S LAW DICTIONARY 903 (9th ed. 2009) (emphasis added).  Taken together, the plain meaning of "current investor" is "a presently-existing entity that has spent money on the purchase of a security or other property with the expectation of earning a profit."

Benefuel contends that the term "current investor" should be defined as "any company currently invested in Benefuel, through any vehicle chosen to invest in Benefuel, whether directly or indirectly."  Benefuel's Brief at 5.  Benefuel's proposed definition expands the definition of "current investor" beyond its plain meaning through the phrases "directly or indirectly" and "any vehicle chosen."  Benefuel's definition seemingly opens the door to including entities that were not then "existing."  Moreover, Benefuel seeks to expand the term "investor" beyond a single entity, when the definition clearly refers to a single entity.  Because Benefuel's

interpretation cannot be reconciled with its plain meaning, the term "current investor" is not subject to two or more reasonable interpretations.  See *Norton v. K-Sea Transportation Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) (holding that a contract is ambiguous "only if it is susceptible to two or more *reasonable* interpretations") (emphasis added).  Thus, the term "current investor" is not ambiguous and parol evidence cannot be considered.

Applying the plain meaning of "current investor," the court must determine whether FHR can be considered an investor as of December 1, 2013 -- the date of the agreement.  It is undisputed that Flint Hills had invested in Benefuel prior to the agreement.  *See* PTE 16.  Moreover, it is undisputed that FHR was formed after the parties had entered into the agreement.  *See* PTE 136.  Benefuel contends that the pro rata ownership clause should apply to Flint Hills and its affiliate FHR -- implying that they are a single entity.  *See* Benefuel's Brief at 5.  In order to succeed, Benefuel must show that its interpretation is the superior interpretation.

While it may be true that Flint Hills and FHR are part of the "Koch family" of companies, Benefuel has not sufficiently shown that the court should consider them the same entity -- and thus "current investors" -- under the agreement.  The logical conclusion of Benefuel's argument is that the court should consider Koch, and all Koch-backed entities, as "current investors" under the agreement simply because one entity, Flint Hills, had previously invested.  Because there are an unknown number of

Koch-affiliated entities, Benefuel's proposed definition would lead to absurd results and expand the definition of "current investor" well beyond its plain meaning. *Osborn ex rel. Osborn*, 991 A.2d at 1160 ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

Moreover, the parties are in accord that the agreement is governed by Delaware law, which takes corporate formalities very seriously. *Case Financial, Inc. v. Alden*, No. 1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009) (holding that corporate formalities are disregarded "only in the 'exceptional case'"). Delaware law specifically holds that a common corporate parent is not a proper basis for disregarding separate corporate existence. See *eCommerce Industries, Inc. v. MWA Intelligence, Inc.*, No. CV 7471-VCP, 2013 WL 5621678, at *27-28 (Del. Ch. Sept. 30, 2013); see also *Vichi v. Koninklijke Philips Electronics N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012) (holding that the corporate structure of the "Phillips family of companies" should not be eradicated despite the Phillips' slogan of "One Phillips"). Similarly, here, the separate corporate existence of the Koch-backed companies cannot be disregarded simply because one Koch entity -- Flint Hills -- invested in Benefuel. Under Delaware law, the two Koch-affiliated companies in question -- Flint Hills and FHR -- are separate entities. Given the plain meaning of "current investor"

as construed under Delaware law, the court cannot conclude that FHR was a "presently existing entity."

Examining the agreement in its entirety reaffirms the conclusion that Flint Hills and FHR should not be treated as the same entity under the agreement. The word affiliates is used elsewhere in the agreement but does not appear in the pro rata ownership clause. *See* PTE 15; DTE 13. For example, the agreement states that if the aggregate investment is provided by "any of Hercules Technology Growth Capital, Suncor Energy Inc., SilverLake Management LLC, Black Corral Capital or CHS Inc. or the *affiliates* of each of the foregoing, the success fee will be reduced to 5% of any Aggregate Investment." PTE 15; DTE 13 (emphasis added).

The court cannot ignore the plain language of the agreement and cannot add words that do not appear on the face of the agreement. See *Charlotte Broadcasting, LLC v. Davis Broadcasting of Atlanta, L.L.C.*, No. CV-13C04143-WCC-CCLD, 2015 WL 3863245, at *4-5 (Del. Super. June 10, 2015), *aff'd*, 134 A.3d 759 (Del. 2016); *Emmons*, 697 A.2d at 746; *Alpine Investment Partners v. LJM2 Capital Management, L.P.*, 794 A.2d 1276, 1286 (Del. Ch. 2002), *as revised* (Mar. 28, 2002) (noting that it is not the proper role of a court to supply omitted provisions to a written agreement). As they did to other clauses in the agreement, the parties could have added the term affiliates to the provision describing current investors if they intended that provision to apply to affiliates of current investors. Moreover, Benefuel could have specifically

required that the agreement note that all Koch-affiliated entities are deemed "current investors." However, under agreement as finally executed, the only reasonable interpretation is that the parties did not intend "current investor" to include affiliates of Flint Hills.

In sum, the words "current investor" refer to only those entities who had invested in Benefuel at the time the agreement was signed. That includes only Flint Hills but not FHR. The pro rata ownership clause, in consequence, applies neither to the FHR mezzanine transaction nor to the 2015 transaction. Therefore, Benefuel owes Centerboard a success fee of 7% of the aggregate investment for both transactions.

2. *Centerboard Is Not Entitled to the Work Fee (Equity) (Count I)*

According to the agreement, the work fee (equity) was "due upon successful completion of a Transaction." PTE 15; DTE 13. The Suncor Transaction closed on June 5, 2014, during the term of the agreement. PTE 32. The closing of the Suncor Transaction constituted a "successful completion of a Transaction," and triggered Centerboard's right to receive the work fee (equity). Centerboard's Brief at 40; Benefuel's Brief at 9. The work fee (equity) was to be paid in equity "at the Transaction price." PTE 15; DTE 13. The Transaction price for the Suncor Transaction was $5.00 per share. Centerboard's Brief at 40; Benefuel's Brief at 9.

Centerboard contends that Benefuel's interpretation of the agreement --
requiring another successful closing of a transaction to trigger the work fee (equity) --
is contrary to Delaware law and is an incorrect interpretation.  Centerboard's Brief at
40.  Centerboard avers that the work fee (equity) was accruing from July 2014
through December 2014.  Centerboard's Brief at 41.  Specifically Centerboard
maintains that the agreement states that the work fee (equity) would be due "upon
successful completion of *a* Transaction," not "upon successful completion of *each*
Transaction."  *Id.* at 40.  Benefuel, on the other hand, asserts that once the work fee
(equity) was paid, there is no specific language in the agreement stating that the fee
continues to accrue.  Benefuel's Brief at 9.

Benefuel's interpretation is the superior interpretation.  The work fee (equity)
states that such fee is "due upon" the successful completion of a Transaction.  The
language "due upon" implies that the work fee (equity) must be paid in full at the
close of a Transaction.  The agreement does not state that the work fee (equity)
continues to accrue each month *after* the completion of a transaction.  Moreover, the
purpose of the work fee (equity) clause was to give Centerboard an incentive to raise
equity.  However, this incentive would be diminished if Centerboard were
automatically entitled to the work fee (equity), for the duration of the agreement,
after the closing of a single Transaction.  Surely the parties anticipated that
Centerboard would attempt to close more than one equity transaction during the

engagement period.  Thus, the court holds that the Suncor transaction did not trigger a work fee (equity) between July 2014 and December 2014.

However, the issue remains as to whether a work fee (equity) was due upon the completion of the FHR mezzanine transaction.  The court has already determined that the FHR mezzanine transaction, which closed in December of 2014 was a "successful completion of a Transaction."  However, unlike the definition of Transaction, the work fee (equity) clause, by its plain language, contemplates payment only upon the closing of a purely equity transaction.

Upon reviewing the evidence, the court determines that the FHR mezzanine transaction involved a "hybrid security" "because it has aspects of debt and it has aspects of equity."  *See* Trial Transcript, Vol. I, 113:8-17, 199:18-20, Vol. II, 14:20-24.  Specifically, Benefuel executed a secured promissory note in favor of FHR in the amount of $27,150,000, and Benefuel issued to FHR warrants for the purchase of 814,500 shares of common stock.  *See generally* PTE 101.  Such a hybrid transaction is clearly not a purely equity transaction that would trigger a work fee (equity).  The agreement contemplates that Benefuel would pay Centerboard in equity at the share price of any equity raised by Centerboard.  Therefore, Benefuel did not breach the

agreement by withholding the work fee (equity) between July and December of 2014.[3]

## C. Pre-Judgment and Post-Judgment Interest

### 1. *Pre-Judgment Interest*

Delaware law governs the award of pre-judgment interest in this case. *Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994) ("State law governs the award of prejudgment interest in diversity cases."). A plaintiff is entitled to recover pre-judgment interest for a breach of contract claim. See *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 485 (Del. 2011). "Interest is awarded in Delaware as a matter of right and not of judicial discretion." *Moskowitz v. Wilmington*, 391 A.2d 209, 210 (Del. 1978); *Delta Eta Corporation v. University of Delaware*, 2 A.3d 73, *2 (Del. 2010) ("In a Delaware action based on breach of contract or debt,

---

[3]     The court notes that the doctrine of *contra proferentum*, construing the term against the drafting party, is not mandatory. "The rule of *contra proferentum* is one of last resort that will not apply if a document can be interpreted by applying more favored rules of construction." *Zimmerman v. Crothall*, 62 A.3d 676, 698 (Del. Ch. 2013). "It is less likely to be appropriate where knowledgeable and experienced parties to a contract engaged in a series of negotiations." *Id.* Here, as discussed above, the agreement went through extensive negotiations by two sophisticated entities that were represented by counsel. Thus, *contra proferentum* should not be applied in the instant case. See *Union Fire Insurance Company of Pittsburgh, P.A. v. Pan American Energy LLC*, No. CIV.A. 19629-NC, 2003 WL 1432419, at *4 n.28 (Del. Ch. Mar. 19, 2003) ("[The clause at issue] was the product of negotiation between two highly sophisticated parties, of comparable bargaining power, who presumably had access to counsel. As such, the principle of contra proferentum is inapplicable.").

prejudgment interest is awarded as a matter of right.").  Pursuant to the Delaware statute, "the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due."  6 Del. C. § 2301(a); see also *Carey v. McGinty*, No. CIV.A. 86C-JL17, 1988 WL 55336, at *7 (Del. Super. Ct. May 18, 1988).

For the FHR mezzanine transaction, pre-judgment interest shall run on the sum of $1,900,500[4] at the rate stated in 6 Del. C. § 2301(a) from December 19, 2014, to the date that judgment is entered.  For the 2015 transaction, pre-judgment interest shall run on the sum of $420,000[5] at the rate stated in 6 Del. C. § 2301(a) from December 18, 2015, to the date that judgment is entered.

## 2.  *Post-Judgment Interest*

"In a diversity case, the federal post-judgment interest statute applies."  *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 435 (5th Cir. 2003); *Boston Old Colony Insurance Co. v. Tiner Associates Inc.*, 288 F.3d 222, 234 (5th Cir. 2002) ("[P]ost-judgment interest is calculated at the federal rate, while pre-judgment interest is calculated under state law.").  In addition to contractual damages and pre-judgment interest thereon, Centerboard is also entitled, under federal law, to post-judgment

---

[4]	7% of FHR's investment of $27,150,000 in the FHR mezzanine transaction.  PTE 15; DTE 13.

[5]	7% of FHR's investment of $6,000,000 in the 2015 transaction.  PTE 15; DTE 13.

interest on those sums.  28 U.S.C. 1961(a); see also *Boston Old Colony Insurance Co.*, 288 F.3d at 234 ("[T]his circuit has required that post-judgment interest at the federal rate be assessed against the pre-judgment interest.").

IV.  <u>CONCLUSION</u>

For the reasons stated above, Centerboard is entitled to its requested relief on Count II and Count III.  However, Centerboard is not entitled to relief on Count I.

Counsel for Centerboard shall, within ten days of this date, submit a proposed form of judgment in conformity with this memorandum of decision.

**SO ORDERED**.

January 20, 2017.

**A. JOE FISH**
**Senior United States District Judge**